May I please the court, Arlene Chow from Hogan Levels on behalf of Takeda. The intrinsic evidence does not support the district court's extraneous limitation that the enteric coat and sustained release agents must be chemically distinct. Let's first take the plain and ordinary meaning of the claim. It's clear it does not require chemical distinctness. The claim recites two distinct components but does not specify how the components are distinct. We submit that the court improperly conflated distinctness with chemical distinctness. There are different types of this. What distinctness do you think the claim refers to? The claim is silent and it captures all forms of distinctness and in our briefs we identified both physical and chemical distinctness. There certainly was no need given the clear language to import the requirement that that distinctness must be chemical, especially when there are different forms of distinctness including physical distinctness, Your Honor. And, Your Honor, so two components they can be chemically the same and yet can be physically distinct and the specification does not contradict the very clear claim language on this point. There's no definition. The claim language is hardly clear when it uses the word component as to whether that's a separate physical component or a chemical component, right? Your Honor, the use of the term component goes to the fact that the two components are distinct. There's a distinct... You said it was clear. I don't understand how you can argue that it's clear. Your Honor, there's no language, there's no distinction being made between physical and chemical distinction. The use of the two components is referring to the enteric coding agent and the sustained release agent and we do agree that they are chemically distinct, which is what the district... But in the specification, I didn't see any example in which the components were the same. Did I miss it? Your Honor... In terms of clarity or what one would ordinarily draw from the specification. So, Your Honor, the specification in referring persons of skill in the art to the enteric coding agents and the sustained release agents stated that they can both be methacrylate copolymers and that is at column 9. But then it describes different copolymers, right? Your Honor, yes, but Your Honor, they are non-limiting. The examples are only... The list of enteric coding agents... I think Judge Newman's question was whether it ever shows using the same one and the answer is no, it doesn't, right? But it does refer... It does not specifically cite the specific copolymer as falling into both camps. However, persons of skill in the art, as made clear by the OIDRGID L30D55, would understand that there are methacrylate copolymers that fall in both camps. And there are sites within the record directly tailored towards OIDRGID L30D55, which is a methacrylate copolymer. So, from the perspective of a person of skill, an ordinary skill in the art, they would understand that context matters. And the specification itself states that the enteric coding agents and sustained release agents can both be methacrylate copolymers. Some must resort to the extrinsic evidence, must resort to the extrinsic evidence in order to undermine what is taught by the specification. But wait, the specification doesn't teach that component means physically separate, right? Nor does it teach that it's chemically separate as well. The answer is it does not teach that component means physically separate, right? It's silent on the issue, Your Honor. However, persons of skill... However, the claim is directed to two distinct components, Your Honor. And cornstarch, which is the cooking analogy, the direct correlation is shellac. Shellac, which is a very common pharmaceutical formulation, it's undisputed, is known by persons of skill in the art to be both enteric coding agents and sustained release agents. Lieberman, which is Sun's own treatise, which they cited as authoritative, stands for that proposition. It is cited as both an enteric coding agent and a sustained release agent. And, Your Honor, this particular excipient is one of the most widely used excipients in pharmaceutical formulation. And the same also holds true with deuterogen L30D55, which is the specific excipient that Sun uses in its formulation. It's known. I think the record is really replete with this knowledge of persons of skill in the art that excipients, it matters what the context is, how it's being used. Now, the prosecution history doesn't contradict what we submit as the clear claim language. There was no clear and unmistakable disclaimer or disavowal as to chemical distinctness. Chemical distinctness was not discussed during prosecution. Neither the examiner nor Takeda stated that the enteric coding agents and the sustained release agents must be chemically distinct. Now, given the fact that the claim is very clearly just directing persons of skill in the art to the enteric coding agent and the sustained release agent, there is nothing in either the specification or the prosecution history that would require, require, importing in the limitation that they must be chemically distinct. We've got a potentially ambiguous term here that doesn't have to be a disclaimer to use the specification to construe the term. Your Honor, we submit that the term is not ambiguous. It is very clear, and yet there is... How can a component be clear? A component is referring to the two different agents, enteric coding agents and sustained release agents. It's not stating that they must be chemically distinct. So I think the claim in and of itself is saying that there's two different things. And we're not walking away from that, Your Honor. However, the question is whether or not they must be chemically distinct, which is an additional requirement placed on top of the very clean language that is before the court today. Now, and indeed, you know, as I was stating, the examiner and Takeda, there were no... The point was not made. The argument was not raised that the two agents had to be chemically distinct. In terms of the prosecution history in relation to the 2-1-2 prior art reference, Takeda only stressed that there was no sustained release agent present. But they did not say anything about chemical distinctness, and nor did Takeda state that the oidrogid L30D55, that it could not be a sustained release agent for the purposes of the patent, which would have been a very broad disclaimer, as opposed to just saying that in relation to the prior art, the oidrogid was not behaving as a sustained release agent. There's really a question here of scope. And so, Your Honor, in terms of the extrinsic evidence standing for the proposition, again, I would just, again, cite to Shellock and the oidrogid L30D55 for the proposition that persons of skill in the art do understand that a particular chemical, a particular chemical component, depending on the context in which it's being used, can have two very different functions. Both our experts agreed on that point, and indeed, I think it's just understood as referred to by Sun's own authoritative treatise. This is something that really is consistent with our position as to the claim, the specification, and the prosecution history. In terms of the 212 reference, actually, in terms of Sun's formulation, I would like to stress this in terms of context. There are two distinct layers within Sun's formulation, and I do want to stress that although there is an oidrogid that is appearing in both layers, What does it take to be a separate component under your view? If you have a substance which acts both as an enteric coating layer and as a sustained release agent, and you put some of that in the pill or whatever it is, is that sufficient? Your Honor, the sustained release agent in the context of this invention is made clear by the Shimizu Declaration. It serves the purpose of... I don't think you're answering my question. My question is, you've got this compound in the pill, and it's just all mushed together. Are you saying that because it acts both as an enteric coating layer and as a sustained release agent, that it satisfies the claim? It does if they're in two different layers by way of example. It has to be two different layers? Yes, Your Honor. A good example. Well, Your Honor, if you're doing an infringement analysis, and I will just take Sun's particular formulation as an example, there are two different enteric coating layers. How do you know it has to be two different layers? Your Honor, it can be plural. The specification allows for plural enteric coating layers as taught in Column 16 of the patent, and that is undisputed by the parties that the enteric coating layer can be plural. Now, in the context of the specific chemical... So it's all in a single layer. There's no infringement? So in the context of where there's... Wait. Try to answer my question. I will, Your Honor. If there's a single layer, a single chemical component, and you cannot distinguish its functions within that layer, there is no infringement. Well, suppose you can distinguish the functions. It's a single layer, but the thing acts both as an enteric coating agent and as a sustained release agent. Is there infringement or not? Only in the context where you would find that there's a distinct behavior by the chemical. I would submit that typically that would not be the case, Your Honor. So the answer is it could infringe? I find it unlikely. So you're claiming both functions, but it's in a single layer. It could infringe? I say no, Your Honor. No. I'd say that what we would say is that there needs to be typically distinct layers, and in the context of distinct layers, you can point to the component, and in one layer it's behaving as an enteric coating agent, and in another layer it's behaving as a sustained release agent. That works. If I could just return to Sun's formulation because it would give some concrete context to this argument, Your Honor. The enteric coating layers are distinct. There are different amounts of eutrogytes in both layers. The recipe for each layer in Sun's enteric coating agent are different. There's two different recipes. One recipe with a substantial amount of eutrogyte and other excipients, which are different from the recipe for the second enteric coating layer, which is substantially less eutrogyte and a different excipient mix. There, in that situation, same chemical, two different layers behaving very differently, chemically distinct enteric coating layers. So, Your Honor, yes, in a situation where there is a single layer and there's a single eutrogyte and we can't distinguish what their behavior is, we would submit there is no infringement, yes. However, in this particular situation where you have two distinct layers with two distinct chemical compositions, that's different. That's where we say that's different, Your Honor. So there, in our view, given the clear claim language saying that there must be an enteric coating agent and a sustained release agent, in view of the specification allowing for multiple enteric coating layers, we would say that that claim is being practiced because there are chemical distinctions between the enteric coating layers. They're multiple, but they are not the same. They're behaving differently, Your Honor, and their makeup is different. One layer is very distinct from the other. Why don't you save your rebuttal time? Thank you. Good morning, Your Honors. Mark Schuman representing the Sun Appellees. I don't want to take up too much of your time on this, but I find your confidentiality markings in your brief to be astonishing. I mean, you know, for example, on page six you say, Takeda needs the, and then you blank out enteric coating agent, and then you block out sustained release agent. That's just a description of what's required. How could that, how could you mark that as confidential? What we're trying to do is prevent a description or a, we have a certain component used for two different layers in our product. Look, look, that's what the whole argument is about here, and you're marking it as confidential. It's ridiculous. We're trying to prevent our competitors from figuring out how we're doing our, But it doesn't describe your product. It describes what the claim requires. By understanding the argument that we're making, you can understand, you can, No, you're describing on this page what the claim requires, and you're marking it as confidential. You cannot do that. Well, I apologize, Your Honor. I do, I do believe in my heart that you can, you can read these briefs and understand what our product is if you understand what these two components are. I'm not saying there aren't some confidentiality markings here which were appropriate, but there are others which make no sense and are simply a description of the legal issue that's involved here. I apologize, Your Honor. I truly believe, and I'm sorry that we disagree on that, and I'll try to do better in the future. Now, if I am right, Your Honor, I think that we talked about in the first talk with my friend here about the specification a little bit, and I'd like to turn to the prosecution history if I could, because I think that's really where things crystallize for us as far as these two distinct components are concerned. There are, as you pointed out earlier, there are examples in the specification. There are descriptions at column nine of these excipients, and they don't overlap. But I think if you go to the prosecution history, that's really where one's skilled in the art starts to get a crystallization, an understanding of what's happening and what this invention's all about. You heard my friend tell you that the function of the sustained release agent is to cushion. Now, if you read the patent, the 994 specification, you will not see a description in that specification of cushioning. Nowhere is the function of the sustained release agent described to one's skilled in the art. You would think, as one's skilled in the art, that a sustained release agent is going to function to sustain the release of the drug. That's typically what one's skilled in the art thinks about when they think about a sustained release drug. It doesn't do that in this invention. It actually does something completely different, and the specification doesn't tell us that. I agree with that reading. At the same time, apparently there are two layers applied. What is the reason for using two layers? The two layers, typically, these are very small, as I understand it, and it's hard to get a complete coating because of surface tension on these very small beads. So often you have to coat them twice. But you'll see in the patent, for instance, at example eight, you'll see whenever they coat them twice, they still use a two-component system where they have the sustained release agent and the interior coating agent because they need to have that cushioning effect on that second coating. What they're trying to do is get a complete coating because you may get some air, not bubbles, but you may get some surface tension that creates an incomplete coating. So you'll want to coat it twice to get that coating on these very small beads. But you still have to dissolve the interior coating after it passes through the stomach. Correct. And you still need some sort of surfactant or whatever, water-soluble component. Exactly. And it can't really be the same product, so it must be the additives. That's right. It's the additive. It's the sustained release product that's giving that cushion to the interior coating product because the interior coating agent is brittle. And it will crack if it's compressed. And so what they're doing is they're putting in the sustained release agent to give it some compressibility. But the specification doesn't tell us that. And one skilled in the art doesn't recognize that really until you get into the prosecution history. And you see what happens in the Shimizu declaration, that 132 declaration that they put in during the prosecution. There, what they do is they compare the prior art in the Shimizu 122 European application to the claimed invention. And what they do is they say the prior art has a one-component layer. It has the L30D55 enteric coat. And our invention has two components. It has L30D55 and NE30D. And they compare the two in the Shimizu declaration. And they conclude that their system has better acid resistance and better they have another property, but it's all related to whether it cracks or not in the compression of the tablet. And they conclude that they get a better tablet. And one skilled in the art then begins to realize that what's happening here is it's not the sustained release aspect of this recipient, but it's this compressibility. And that's what's happening. So the examiner then is, here's where I want to get into the prosecution. When faced with this amendment or this 137... The compressibility relates to the tableting, doesn't it? It doesn't relate to anything else? That's right. It's solely to the tableting, not to the dissolving of the tablet or anything of that nature at all. It's whether it cracks when it's tableted. So how does that affect the water dispersion? It only affects it if there's a crack in the tablet, in the layer. However, when it goes into your stomach, then the stomach acid can find its way into the crack, which is not good. You want to have a layer that's not cracked. So one skilled in the art would understand that if the layer is not cracked, then it's good. And so this addition of the sustained release agent, suddenly the light bulb should go on to one skilled in the art. And the examiner recognizes that. If you look at his rejection, he says at appendix page 927, he says the declaration is not commensurate in scope with the claims. They had very broad claims at this point. Basically, they just claimed an enteric-coated tablet with a sustained release component. So he says the declaration is not commensurate in scope with the claims. Your claims are too broad. He says while the claims are very generic, the declaration is directed to, and this is important, a specific tablet having a specific acid labile drug or a specific acid labile physiological active ingredient. Specific tablet, specific drug, essentially. There is no claim present that is the scope of applicant's declaration. Again, he's iterating, your claims are too broad given your declaration. The degree of hardness and acid resistance have not been claimed. Again, your claims are too broad. He's telling them how to narrow them. Further, the prior art does recognize the degree of acid resistance and applicant's declaration admits that the prior art does have a degree of hardness. Hence, you haven't shown any unexpected results over the prior art. So he identifies three things. He says your claim is too broad given your declaration. He says you've shown me a specific tablet, a specific drug, and specific hardness. Your claim is too broad. He's telling them narrow your claim to a specific tablet, a specific drug, and a specific hardness. So what do they do? It's exactly what they do. If you look at the next amendment on page A933, they narrow the claim to lansarpazole, to a specific hardness, and to the language that's here on appeal. A first component comprising the sustained release agent and a second component comprising the interior coding agent. I had those reversed, sorry. They did that specific because the examiner said your claims were too broad. You need to essentially write a picture claim to get these things allowed. You need to narrow it down. And the remarks they made to the patent office were telling. They said on page 935 of the appendix, for purposes of advancing this prosecution, in the present case, applicants have amended claim one without prejudice to filing future applications. And now they recite the limitations, et cetera, that I just mentioned. What are they saying to the patent office? We don't like it that you've made us narrow the claim, but we narrowed the claim down to get something from you. And without prejudice, we're going to come back and try to get broader claims. All of this is interesting, but really doesn't address the central claim construction issue here, which is whether it has to be chemically distinct. And in the prior art, is there a disclosure of using, for example, this Eurojet L-30D-55 as both an interior coding agent and a sustained release agent? I don't think it does, no, Judge. There's no evidence of that in the record. And in fact, I do think this prosecution is very important to that because the... How did it get out of the prosecution chemically distinct? Because the declaration that they filed, the Shimizu declaration, the 132 declaration, only had a chemically distinct second component. That's all there was. And the examiner required them to claim the specific tablet that was in that declaration. And that's what they did. They narrowed it down to a two-component tablet. That's what they did. The declaration that Shimizu put in was not a multilayered tablet, such as we're hearing about today with the appellants. They didn't put a multilayered tablet in. Where does the declaration address this? It's the Shimizu declaration. What page? Let's look at it. It's starting about A-93. And they have two examples, Judge. Example A starts on A-894, which is the prior art. And then the example from the patent starts on A-896. And in fact, you can actually see... How does this help you? Explain to me how this helps you, how this declaration helps you. Because what they did is they put in a one-component prior art system versus a two-component system from their patent. And they explained to the examiner that the addition of the second chemically distinct component made it patentable. And the examiner said, yes, you're right. Where do they say that in this declaration? They don't. It's what one skilled in the art would take from that. And if you want... Who said that? The examiner. The examiner rejected them and said you have to narrow... Who said... You're construing this declaration as saying something which you say isn't here explicitly, though one skilled in the art would understand it. Okay. Who told us that that's what this declaration means? Let's look at Takeda's own expert and what he said about this declaration, which the district court had in front of him. He's one skilled in the art. At appendix 158. And I'm looking at paragraph 22 of Takeda's own expert. Further, during the prosecution, one of the co-inventors of the 994 patent, Dr. Shimizu, submitted a declaration showing that a tablet, according to the 994 patent, with an enteric coding agent and a sustained release agent in the enteric coding layer was superior to a prior art tablet with just an enteric coding agent in the coding layer. But that doesn't say chemically distinct. That's what was in there. There weren't anything else but two separate chemically distinct chemicals. If you look at the last sentence of page 23, the last sentence of paragraph 23, based on the Shimizu declaration, a person of ordinary skill in the art would understand the inclusion of a sustained release agent prevented the enteric code. The word inclusion, he has to be talking about something chemically different. That's what was done there. This is what one skilled in the art, their own expert, says about this. These are chemically distinct. These are two chemicals. If you look at the Shimizu declaration, how can they not be anything different than that? When their own expert says the same thing about it. You're supposed to interpret the claims as one skilled in the art would look at them and be informed by the prosecution history, be informed by what's in the specification. There's nothing that would ever tell you that two components should be separated in a layer, as they suggest now on appeal. Nothing. Whenever two components are separated in a layer, or there's two layers in their patent, there's always two components in each layer. There's just no suggestion at all. One skilled in the art would never have thought of that. Not even their own expert. How can that be error for the district court to have interpreted the claim consistent with the way every other person in the art has interpreted these claims? I'm coming up on my closing, Your Honor. Thank you very much. Your Honor, Counsel just mentioned that he believed that the record was silent on whether or not Eudritte L30D55 is a sustained release agent. I thought I'd provide some sites for you. At the Appendix 405, there's a 475  is a sustained release agent. I thought I'd provide some sites for you. At the Appendix 405, there's a 475 patent, which is referring to Eudritte L30D55 as a sustained release agent. At Appendix 733, Evonik, a manufacturer of Eudritte L30D55, is identifying it in relation to that function. And then, of course, there's also our experts. Both his deposition at 2437 and his declaration in 162, which stands for L30D55. It can be both an enteric coding agent as well as a sustained release agent depending on the context. So, Your Honor, in terms of Takeda's expert's declaration and his testimony, it stands for L30D55 in the Shimizu Declaration. In that context, for the 212, it was behaving as an enteric coding agent. But that's distinct from whether or not Eudritte L30D55 in proper context in other applications can be used as a sustained release agent. And that's precisely what our experts stated in his deposition at Appendix 2437, page 216, lines 1 through 16. So we submit the record does stand for that proposition. And Your Honor had correctly pointed in relation to the prosecution history, I just wanted to stress that, again, Takeda said nothing about chemical distinctness between the enteric coding agent and sustained release agents. I did listen to and hear you state that and I just did want to stress that again in my remaining time, Your Honor, unless there's additional questions. The honorable court is adjourned until tomorrow morning at 10 a.m.